IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:22cr90-MHT |
| | ) | (WO) |
| KENRIC NIGEL CADE | ) | |

OPINION

Defendant Kenric Nigel Cade pled guilty to one count of distribution of a controlled substance, namely five grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and one count of possession with intent to distribute a controlled substance, namely 50 grams or more of methamphetamine, also in violation of § 841(a)(1).

Cade's first offense carried a five-year mandatory minimum sentence under 21 U.S.C. § 841(a)(1) and (b)(1)(B), and his second offense carried a ten-year mandatory minimum sentence under 21 U.S.C. § 841(a)(1) and (b)(1)(A). However, he qualified for the "safety valve" provision of the First Step Act, which allows the court discretion to grant relief from these

statutory minimums.  *See* 18 U.S.C. § 3553(f).

Under the United States Sentencing Guidelines Manual (hereinafter "U.S.S.G."), and without taking the safety valve into account, Cade faced a Guidelines range of 188-235 months.  However, he moved for a significant downward variance, based on both the safety valve and policy objections to the Guidelines' approach to methamphetamine sentences.

As orally explained at his sentencing and memorialized below, the court granted Cade's motion for a downward variance.  The court found that he qualified for relief under the safety-valve provision of § 3553(f).  Further, taking into consideration its prior decisions in *United States v. Johnson (Johnson I)*, 379 F.Supp.3d 1213 (M.D. Ala., 2019) (Thompson, J.) and *United States v. Johnson (Johnson II)*, No. 2:21cr330-MHT, 2022 WL 3021372 (M.D. Ala. July 29, 2022) (Thompson, J.), the court determined that the methamphetamine guidelines failed to reflect adequately the 18 U.S.C. § 3553(a) sentencing factors in his case.

2

Applying those factors, the court sentenced him to 92 months of imprisonment, to be followed by five years of supervised release.

## I. Background

In February 2021, officers from the Wetumpka Police Department and the Elmore County, Alabama Sheriff's Office conducted a controlled purchase of approximately one ounce of crystal methamphetamine from Cade at his residence in Wetumpka. According to a laboratory analysis conducted after the purchase, the drugs that Cade provided amounted to 27.7 grams of high-purity methamphetamine, also known as "ice."*

The following month, a lieutenant of the Elmore County Sheriff's Office conducted a traffic stop on Cade in response to a traffic violation. The

---

*Methamphetamine purity refers to the "weight of the controlled substance, itself, contained in the mixture or substance." U.S.S.G. § 2D1.1(c), Notes B-C. For example, a methamphetamine mixture weighing 10 grams, at 50 % purity, contains five grams of actual methamphetamine. The U.S.S.G. defines high-purity

3

lieutenant conducted a probable-cause search of the car and a pat-down search of Cade, and found additional methamphetamine in the car and in Cade's shirt pocket. Laboratory analysis of the drugs concluded the seized drugs totaled 113.7 grams of ice.

After the traffic stop, the officer placed Cade under arrest and transported him to the Elmore County Jail. While in jail, Cade agreed to an interview with officers from the Drug Enforcement Administration. He voluntarily told the DEA that he had been obtaining crystal meth from a variety of suppliers in Montgomery, Alabama, for two years prior to his arrest. He provided estimates of the frequency and quantity of his purchases, which the U.S. Probation Office conservatively calculated to equal roughly 1,282.84 grams of methamphetamine in the presentence report. Cade did not object to this calculation.

Because the 1,282.84 grams of methamphetamine that Cade described were never actually seized, the chemical

---

methamphetamine, known as "ice," as a mixture or

purity of those drugs was never analyzed in a laboratory setting. However, in the presentence report, the Probation Office performed its calculation on the assumption that the additional methamphetamine was also more than 80 % pure, and therefore qualified as ice. *See* Presentence Report at 6.

The 27.7 grams of ice that police obtained via controlled purchase in February 2021, the 113.7 grams of ice that police seized in March 2021, and the 1,282.84 grams of methamphetamine that Cade, during his interview with the DEA, voluntarily confessed to having purchased add up to a total of 1,424.24 grams of high-purity methamphetamine, the figure ultimately used by the Probation Office to calculate Cade's offense level for sentencing purposes.

Prior to this offense, Cade had several state-level criminal convictions, almost all involving the possession of controlled substances. Additionally, at the time of sentencing in the instant case, he was

---

substance of at least 80 % purity. *Id.* at Note C.

facing additional charges in state court that were related to methamphetamine and prescription drugs. He had no prior federal convictions and no convictions for violent crime.

In the instant case, the parties entered a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(A) and (C). Cade agreed to plead guilty to distribution of five grams or more of methamphetamine and possession with intent to distribute 50 grams or more of methamphetamine; the government agreed to recommend a sentence of 120 months, which is less than the bottom of the applicable Guidelines range. Cade also agreed to waive any right to request an alternative sentence. However, after Cade's initial appearance at sentencing, he decided to withdraw from the plea and agreement. He entered a new guilty plea and sentencing resumed without an agreement in place.

With respect to Cade's personal history and characteristics, the presentence report notes that he was first exposed to drugs in early childhood, when his

father would smoke crack cocaine in the house. In addition to witnessing his father's crack-cocaine addiction, Cade grew up in a neighborhood where drugs were readily available. He was first arrested for drugs when he was 23, and he reports more than two decades of addiction to methamphetamine, cocaine, and prescription opiates. Aside from a brief substance-abuse-treatment program he completed while incarcerated in 2016, he has never received any substance-abuse treatment to deal with his addiction issues. He has never been evaluated for mental-health purposes, nor received any form of psychological treatment, and he has never received a formal diagnosis for any substance disorder.

## II. Discussion

For sentencing purposes, the parties concurred with probation's determination that Cade had a criminal history score of VI and a base-offense level of 34. The offense level was lowered by three, to 31, to

account for his acceptance of responsibility, in accordance with U.S.S.G. § 3E1.1(a) and (b).  Based on the criminal history score of VI and the offense level of 31, probation calculated a guidelines range of 188-235 months and recommended a sentence of 180 months.

As probation noted, Cade's convictions also trigger two mandatory minimums under their associated statutes.  The minimum term of imprisonment for distribution of five grams or more of methamphetamine is five years.  *See* 21 U.S.C. § 841(a)(1) and (b)(1)(B).  The minimum term for possession with intent to distribute 50 grams or more of methamphetamine is ten years. *See* 21 U.S.C. § 841(a)(1) and (b)(1)(A).

Despite these statutory convictions, Cade argued that he qualified for the safety-valve provision of the First Step Act.  *See* 18 U.S.C. § 3553(f).  The safety valve provides the court with discretion to grant relief from a mandatory-minimum sentence for defendants who meet the statute's enumerated criteria.  *See United*

*States v. Garcon*, 54 F.4th 1274, 1284 (11th Cir. 2022) (en banc).  The statute also provides for a two-level reduction to the defendant's offense=level calculation under the Guidelines.

Cade requested a significant downward variance on the grounds of (1) his eligibility for the safety valve; (2) policy disagreements with the manner in which the Guidelines equate drug quantity and drug purity with culpability; and (3) the mitigating factor of his childhood exposure to drug addiction and ongoing substance abuse struggles.  Based on these factors, he asked for a sentence of 92 months.

The government opposed Cade's request and recommended a smaller variance of 120 months.  At oral argument, the government argued that the court should abide by the mandatory minimums set out by the statutes of conviction, rather than applying the discretionary safety valve.

9

## A. Legal Standard

A district court has considerable discretion in determining an appropriate sentence, so long as the sentence is reasonable. *See United States v. Irey*, 612 F.3d 1160, 1188-89 (11th Cir. 2010) (en banc). The court must consider the factors set out in 18 U.S.C. § 3553(a), including the recommended sentencing range under the Sentencing Guidelines and any pertinent policy statements. *See* § 3553(a)(4)-(5). However, the guidelines are "effectively advisory," not mandatory, and there are times when a sentencing range suggested by the Guidelines is at odds with the underlying objectives of the sentencing process. *Kimbrough v. United States*, 522 U.S. 85, 90-91 (2007). A variance may be appropriate where "the case at hand falls outside the 'heartland' to which the [United States Sentencing Commission] intends the individual Guidelines to apply," or where the "Guidelines sentence itself fails properly to reflect § 3553(a)

considerations." *Rita v. United States*, 551 U.S. 338, 351 (2007).

### B. Application

In determining Cade's sentence, the court began "by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Neither party objected to probation's calculation of the Guidelines range in the presentence report, and the court agrees that it reflects the correct application of the Guidelines to Cade's case. This court therefore began its calculations with a criminal history score of VI and a base-offense level of 34. The offense level was reduced by three to account for Cade's acceptance of responsibility, resulting in an offense level of 31. For a defendant with a criminal history score of VI and an offense level of 31, the Guidelines suggest a sentencing range of 188-235 months.

The court then turned to whether Cade was eligible for an additional two-level reduction in offense level,

as well as overall relief from mandatory minimum sentencing, under the safety-valve provision of the First Step Act.

As the government correctly noted at sentencing, the Eleventh Circuit Court of Appeals' recent ruling in *Garcon* leaves it to the discretion of this court to determine whether to impose a shorter sentence based on the safety-valve provision. *See Garcon*, 54 F.4th at 1278.  Here, given the specific facts of Cade's criminal history, the court found that applying the safety valve was warranted.  As *Garcon* explains, "the conditions in § 3553(f) are rationally aimed at ensuring that the most dangerous offenders--violent recidivists with a history of serious crime--remain ineligible for safety-valve relief."  *Id.* at 1283.  Cade has accrued a number of convictions related to controlled substances, and clearly struggles with serious addiction issues, but he has no record of violent crimes, and he is not among "the most dangerous offenders." *Id*.

12

The First Step Act also includes a number of disqualifying factors that demonstrate why particular offenders might be unworthy of relief. None of those factors appear to apply to Cade. The court therefore found that granting relief, including a two-level reduction under the safety valve, was in line with Congress's stated intent.

The court turned to Cade's policy disagreements with the Guidelines' approach to calculating sentences based on drug quantity and drug purity.

As this court explained at length in *Johnson I* and *Johnson II*, sentence lengths under the Guidelines "are inordinately driven by the quantity and purity of the methamphetamine involved in the offense," despite the fact that "quantity and purity are unreliable proxies for the offender's role in the crime and his culpability." *Johnson I*, 379 F.Supp.3d at 1215. The Guidelines' conflation of these factors with culpability is not based on empirical data, does not reflect the widespread availability of high-purity

methamphetamine for even street-level dealers and mules, and does "not exemplify the U.S. Sentencing Commission's exercise of its characteristic institutional role" to use such data as the basis for its sentencing determinations. *Kimbrough*, 552 U.S. at 109.

In order to determine the appropriate sentence, and because the facts of the instant case closely paralleled the facts of *Johnson I*, the court applied the same approach to calculating the applicable variance here.

First, with regard to drug purity, this court has adopted a straightforward approach: to recalculate a defendant's base-offense level by using the methamphetamine-mixture guideline, rather than the guideline designated specifically for high-purity ice. This approach provides a necessary counterweight for the Guidelines' drug-conversion chart, which counts high-purity methamphetamine at a rate ten times higher

14

than low-purity methamphetamine, even though purity has no empirical bearing on culpability.

This was *especially* appropriate in Cade's case, as the overwhelming majority of methamphetamine for which he was being sentenced was never tested in a laboratory, meaning its purity was never conclusively established.

Using the methamphetamine guidelines' treatment of one gram of methamphetamine as two kilograms of converted drug weight, and beginning with the 1,424.24 grams of methamphetamine for which Cade was being sentenced, the court found that he was responsible for 2,848.48 kilograms of converted drug weight. This corresponded to a base-offense level weight of 30. In comparison, under probation's original approach, he was responsible for 28,484.8 kilograms of converted drug weight--which corresponded to the base-offense level of 34 that the Probation Office used. Such a significant disparity was both troubling and unjustified, and could

15

not be squared with the ultimate goals of 18 U.S.C. § 3553(a) to provide just punishment for this offense.

By eliminating the distinction between ice and lower-purity methamphetamine when calculating the converted drug weight, the court adopted an approach that directly compensated for its policy concerns. This targeted approach eliminated the non-scientific conflation of purity and culpability so as to ensure that low-level dealers are not punished disproportionate to their level of criminal involvement in the drug trade. The court distinguished its approach from the approach taken in *United States v. Diaz*, No. 11-cr-00821-JG, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) (Gleeson, J.), which identified the same policy concerns, but simply reduced the defendant's guideline range by one-third at the end of the sentencing calculation. While this court shared many of the concerns that the *Diaz* court raises, it believed that calculating high-purity ice as if it were

16

low-purity methamphetamine is a more targeted, rationally-based approach for cases such as this one.

Finally, the court addressed Cade's policy concerns with regard to the Guidelines' approach to drug quantity. As with drug purity, the Guidelines conflate quantity with culpability. As this court explained at length in *Johnson I*, this means that low-level dealers and mules, who are often ordered to traffic high quantities of pills, are punished as if they were high-level kingpins and organization leaders, despite having comparatively reduced culpability.

The quantity of drugs at issue in this case was similar to the quantity at issue in *Johnson I*, where the court compensated for the Guidelines' approach by subtracting two additional offense levels. The court took the same approach here, lowering Cade's offense by two additional levels, to reach its ultimate offense level of 28. As the court noted in *Johnson I*, depending on a defendant's role, an even greater reduction might sometimes be necessary to offset the

17

weight the Guidelines give to quantity--but here, a greater reduction was not warranted.

After beginning with a base-offense level of 30, rather than 34 (to compensate for drug purity), and then subtracting two levels to compensate for drug quantity, two levels as set out by the safety valve, and three levels for Cade's acceptance of responsibility, the court reached a total offense level of 23. For a defendant with a criminal history score of VI and an offense level of 23, the Guidelines would suggest a sentence of 92-115 months.

Finally, this court's decision was further buttressed by the mitigating factor of Cade's long-term struggle with addiction, as well as his early childhood exposure to crack cocaine.

This court, therefore, imposed a sentence of 92 months in prison, followed by five years of supervised release.

DONE, this the 27th day of February, 2023.

                              /s/ Myron H. Thompson
                              **UNITED STATES DISTRICT JUDGE**